**UNITED STATES of America, Plaintiff,**

v.

**ALLEN L. WRIGHT DEVELOPMENT CORPORATION, et al., Defendants.**

No. 85 C 5502.

United States District Court,
N.D. Illinois, E.D.

Jan. 26, 1987.

William F. Murphy, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Michael G. Erens, Kamensky & Rubinstein, Lincolnwood, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff, the United States of America, has moved to compel defendant Allen L. Wright Development Corporation ("Wright") to restore improperly-diverted funds to the United States.

On November 21, 1974, Wright executed and delivered to Chicago City Bank and Trust Company a mortgage note in the amount of $5,449,900.00 secured by a mortgage encumbering real property in Cook County, Illinois. This mortgage was insured by the federal government under the terms of the National Housing Act. As additional security, Wright also executed a security agreement covering certain chattels located or to be located on the same realty securing the note. Wright used proceeds from the note to build the Esma A. Wright Convalescent Center, a nursing home located in Robbins, Illinois. Plaintiff, which sued on behalf of the Secretary of Housing and Urban Development ("HUD"), has since become an owner and holder of the mortgage note by endorsement and of the mortgage by assignment. Plaintiff is also the owner and holder of the security agreement. On June 6, 1977, Wright failed to make an installment payment on the note, and it has not since made subsequent payments sufficient to bring the note out of default.

Pursuant to an acceleration clause contained in the note, the Secretary of HUD declared the entire balance due as of October 31, 1985. This Court granted the

government's motion for summary judgment on the foreclosure, granted plaintiff immediate possession of the property and granted foreclosure of the mortgage.

Presently, plaintiff seeks an order compelling Wright to restore improperly diverted funds to the United States. On August 21, 1974, Wright entered into a Regulatory Agreement ("Agreement") for Multi-family Housing Projects. The Agreement provides:

6. Owners shall not without the prior written approval of of the Secretary:

\* \* \* \* \* \*

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

\* \* \* \* \* \*

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semi-annual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution or any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

The term "surplus cash" is defined at paragraph 13(f) of the Agreement as follows:

"Surplus Cash" means any cash remaining after:

(1) The payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

(ii) All amounts required to be deposited in the reserve fund for replacements;

(iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

(2) The segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held.

The Regulatory Agreement further provides at paragraph 17 that the project owners

do not assume personal liability for payments due under the note and mortgage ... provided that said owners shall remain liable under this Agreement....

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

Plaintiff in its initial memorandum cited the payment of attorneys' fees to Wright's attorneys, Kamensky & Rubinstein, incurred in the defense of this foreclosure action, as an example of improperly diverted funds. Dr. Allen L. Wright, individually, subsequent to plaintiff's motion, paid to Wright the sum of $23,000 for the purpose of reimbursing the Esma A. Wright Convalescent Center for attorneys' fees paid to Kamensky & Rubinstein in defense of this foreclosure. Because of this reimbursement and an offer to restore a cellular phone, Wright contends this motion is moot, rather than contesting the motion.

However, contrary to Wright's contention, plaintiff cited only *examples* of misdirected funds. Plaintiff has requested an

audit of Wright and of Kamensky & Rubinstein to ascertain the total of the project funds improperly diverted. It seeks this audit because of Wright's failure to comply with paragraphs 9(e) and (f) of the Agreement,[1] and because Wright and Dr. Wright have failed to comply with the supboena requiring the production of all documents in support of tax returns of Wright and Dr. Wright from 1977 to 1985.

Because we find that plaintiff is entitled to recover all improperly diverted funds, and to recover the funds from those to whom they were improperly diverted, we will grant its motion. Recovery will include all funds itemized in the motion and all funds discovered through an audit of Wright. It is so ordered.

---

1. The Agreement provides:
   (e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, certified to by an officer or responsible Owner and, when required by the Secretary, prepared an certified by a Certified Public Accountant, or other person acceptable to the Secretary.
   (f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answer to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.